TRAVELERS' INS. CO. OF HARTFORD v. HENDERSON.

(Circuit Court of Appeals, Eighth Circuit. August 5, 1895.)

No. 527.

1. INSURANCE—REPRESENTATIONS OF AGENT.

When a policy of insurance describes the class of risks thereby insured, and the assured has a fair opportunity to read the instrument, the company issuing the same will not be bound by representations made by its agent, in good faith and without any intent to deceive or to defraud, that the policy covers certain risks that are not in fact within its provisions. In construing the provisions of a written agreement, and in determining

its legal effect, the parties thereto act at arm's length, if the agreement is couched in plain language, and no fraud or deceit is practiced.

2. REFORMATION OF CONTRACT—MISTAKE.

The T. Ins. Co. issued an accident policy to one H., by the terms of which death resulting from intentional injuries inflicted by another person was excepted from its benefits. After H. had been killed by an assassin, the beneficiary in the policy brought suit to have it reformed by striking out the exception. Upon the trial, the subagent of the insurance company who solicited the insurance testified that, when he issued the policy, he knew that H. was engaged in a dangerous business, and was likely to be assassinated, and wanted the policy to protect his family in that event, and that he told H. the policy issued to him would cover the case of his being assassinated. It appeared, however, from the cross-examination of the same witness, that he did not intend to make, on behalf of the company, any different contract from that contained in its usual form of policy, and that his representations to H. were due to ignorance of the terms of the policy or misunderstanding of their effect. *Held,* that the evidence was insufficient to justify the reformation of the contract.

Appeal from the Circuit Court of the United States for the District of Wyoming.

Charles N. Potter and Timothy F. Burke, for appellant.

A. C. Campbell and R. W. Breckons, for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge. This was a suit which was commenced by the appellee, Fannie L. Henderson, against the appellant, the Travelers' Insurance Company of Hartford, Conn., in the circuit court of the United States for the district of Wyoming, to reform an accident policy of insurance. The policy in question was solicited and written at Cheyenne, Wyo., by an agent of the defendant company at that place. The material provisions of the policy were as follows:

"Accident Policy. The Travelers' Insurance Company of Hartford, Conn., in consideration of the warranties in the application for this policy and of fifty dollars, does hereby insure (subject to conditions on back hereof, not waivable by agents) George B. Henderson, of Cheyenne, county of Laramie, state of Wyoming, under classification preferred (being a manager of Wyoming Cattle-Ranch Company, not riding on range by occupation), for the term of twelve months from noon of January 7, 1889, in the sum of fifty dollars per week, against loss of time not exceeding 26 consecutive weeks, resulting from bodily injuries effected during the term of this insurance, through external, violent, and accidental means, which shall, independently of all other causes, immediately and wholly disable him from transacting any and every kind of business pertaining to his occupation above stated; or, if loss of one entire hand or foot shall result from such injuries alone within ninety days, will pay the insured one-third the principal sum herein named, in lieu of said weekly indemnity, and, upon such payment being made, this policy shall cease and be surrendered to said company; or in event of the loss of two entire hands or feet, or one entire hand and one entire foot, or the entire sight of both eyes, solely through the injuries aforesaid, within ninety days, will pay the insured the full principal sum aforesaid, provided he survives said ninety days; or, if death shall result from such injuries alone within ninety days, will pay ten thousand dollars to Fannie L. Henderson, if surviving; in event of her prior death, to the legal representatives or assigns of the insured. * * * Agreement and conditions under which this policy is issued and accepted: * * * (4) This insurance does not cover disappearances; nor suicide, sane or insane; nor injuries of which there is no visible mark upon the body; nor accident; nor death; nor loss of limb or of sight; nor

disability resulting wholly or partly, directly or indirectly, from any of the following causes, or while so engaged or affected: Disease or bodily infirmity; * * * medical or surgical treatment (amputations necessitated solely by injuries made within ninety days of the occurrence of accident excepted); intoxication or narcotics; taking poison, contact with poisonous substances, or inhaling gas; sunstroke or freezing; dueling or fighting; war or riot; violating law or the rules of a corporation; intentional injuries inflicted by the insured or any other person. * * * "

The policy was delivered to George B. Henderson, the assured, on the day it was executed, to wit, January 7, 1889, and remained in force and in his possession for 21 months. At the expiration of the first year, the policy was renewed by the assured for another year by the payment of a premium of $50. During the second year while the policy was in force, to wit, on October 7, 1890, the assured was instantly killed by "a gunshot wound intentionally inflicted by one John Tregoning."

The bill of complaint averred as a ground for relief that a mistake was made in reducing the oral agreement between the assured and the insurer to writing, "in this, to wit: That, by the agreement really made, it was agreed that in case the said George B. Henderson came to his death through intentional injuries inflicted upon him by some other person, without his consent, then, in such case, your orator should receive from said defendant the sum of ten thousand dollars"; whereas, by the terms of the policy as reduced to writing, it was provided that, "in case the said George B. Henderson came to his death through intentional injuries inflicted upon him by any other person, then, in such case, your orator should receive nothing." The circuit court found that a mistake had been made, as alleged, in reducing the oral agreement to writing. It accordingly ordered that the policy be reformed by expunging the clause, "This insurance does not cover * * * intentional injuries inflicted by the insured or any other person," and by inserting therein the following provision in lieu therof: "Or if death shall result from injuries intentionally inflicted on the insured by some other person, without the consent of the insured, within ninety days, will pay ten thousand dollars to Fannie L. Henderson, if surviving; in the event of her prior death, to the legal representatives of the insured." 65 Fed. 438. To reverse such decree, the defendant company has prosecuted an appeal to this court.

The general question that arises on the appeal is whether the testimony shows that the parties to the contract of insurance acted under such a mutual mistake, either of law or fact, as a court of equity will undertake to rectify by altering the provisions of the contract. In the determination of this question, the testimony must be examined in the light of the well-established rule that a written agreement will not be altered or reformed on the ground of accident or mistake, unless the proof offered to establish the mistake is clear, satisfactory, and decisive.

Mr. Justice Story once said:

There cannot, at the present day, be any serious doubt that a court of equity has authority to reform a contract where there has been an omission of a material stipulation by mistake. * * * But a court of equity ought

to be extremely cautious in the exercise of such an authority, seeing that it trenches upon one of the most salutary rules of evidence, that parol evidence ought not to be admitted to vary a written instrument. It ought therefore, in all cases, to withhold its aid where the mistake is not made out by the clearest evidence according to the understanding of both parties, and upon testimony entirely exact and satisfactory. There is less danger where the instrument is to be reformed by reference to a preliminary written contract which it was designed to execute. But even here there is abundant room for caution, since the parties may have varied their intentions, or the clause may not have been originally understood by either party to go to the extent now required. And these considerations acquire additional force where circumstances have occurred in the intermediate time which give an intense importance to the asserted mistake." Andrews v. Insurance Co., 3 Mason, 6, Fed. Cas. No. 374.

The same view was expressed by the supreme court in Snell v. Insurance Co., 98 U. S. 85, 90, where it was said that parol proof to establish a mistake in a written contract "is to be received with great caution, and, where the mistake is denied, should never be made the foundation of a decree variant from the written contract, except it be of the clearest and most satisfactory character." [1]

The rule referred to is so well settled that it may be safely asserted that a court of equity has no right to correct an alleged mistake in a written agreement, on the strength of testimony purely oral, if the testimony is to such extent uncertain, equivocal, or contradictory as to leave the fact of mistake open to doubt. Moreover, a court of equity ought to be especially cautious in altering the provisions of a written contract where it has been in force for a considerable period before an attempt is made to reform it, and the parties thereto have in the meantime had ample opportunity to become acquainted with its provisions, and an event has also occurred which renders a change in the terms of the contract of vital importance to the person who is seeking to reform the instrument.

With these preliminary observations, we turn to consider the mistake alleged in the case in hand and the testimony that was offered to establish it. The mistake consisted, as it seems, in embodying in the written policy a clause that the defendant company should not be liable for "intentional injuries inflicted by the insured or any other person," whereas, by the terms of the oral agreement antedating the policy, which the parties, as it is claimed, intended to reduce to writing, it was understood and agreed that the insurer should be liable for intentional injuries inflicted on the assured by a third person. The proof relied upon to establish the mistake consists principally of the testimony of Gideon M. Kepler, a subagent of the defendant company, who solicited the policy in question. We have examined the evidence of this witness with great care, and it may be conceded for the purpose of this decision that it tends to establish the following facts, to wit: That, prior to the issuance of the policy, said Kepler was aware, either from statements made to him by the assured or from public rumor, that the assured was engaged at the time in a very dangerous occupation, to wit, that of superintending a ranch in the northern part of Wyoming; that troubles existed in that

[1] See, also, Coal Co. v. Doran, 142 U. S. 417, 12 Sup. Ct. 239.

locality; that the assured had already been shot at from ambush on one occasion; and that he desired a policy of insurance to protect him against anything that might happen in the course of such occupation, including the risk of being assaulted or killed by an assassin. The witness admits, in substance, that he intended to deliver to the deceased a policy that would protect him against the aforesaid risks, and that he supposed he had done so when he delivered the policy in suit, and that he probably told the deceased "that if he was accidentally killed up there, or if any one killed him as he was going to or from the city of Cheyenne, the policy would cover him." While the witness testified to the foregoing effect on his direct examination in favor of the plaintiff, yet it sufficiently appears, we think, from statements made by him on his cross-examination, that he had no intention of making a different contract on behalf of the defendant company than that embodied in the printed forms of policy then in his possession and then in use by the defendant company, one of which was actually filled out and delivered to the assured in the form in which they are ordinarily issued by the company. He was asked the following questions; and answered them as follows:

"Q. Had you read the policies of insurance, these blank forms of policies in the Travelers', at the time you solicited this insurance of Mr. Henderson? A. Well, that I could not say. * * * Q. Now, did you intend that the contract that was to be consummated in a policy should cover any more than that which was indicated by the written application which you took? A. No. Q. Was what you said to Mr. Henderson in relation to what risks the policy assumed to cover merely an expression of opinion on your part as to what the policy actually did cover, rather than an agreement on your part as to what the policy should cover? Isn't that true, Mr. Kepler? A. Well, I don't know about that. I assured him that he would be covered as against anything that might happen [to] him. I remember of telling him that. I was honest in what I told him,—that, unless he died naturally or got into a fight with somebody, that it would cover him. Q. That was merely an expression of your opinion as to what the policy insured him against? A. Yes, sir. Q. And the same was your intention and understanding from what was said at the time the renewal receipt was given to him, wasn't it, Mr. Kepler? A. Yes, sir. * * * Q. So, when you say you intended the policy to insure him against anything that happened in that north country, you meant merely everything which could be insured against under the terms of the policy. That is your understanding, is it not, of your statement to him? A. Yes, sir * * * Q. Had you read over one of these policies at the time you solicited this insurance? A. That I don't know. They had different forms of policies a little while before that. I don't know whether I read that policy over or not. I can't say. * * * Q. It wasn't your intention, was it, in making your agreement with Mr. Henderson, to make any other agreement than that shown in the policy as afterwards completed? A. No, sir; it wasn't."

And on his redirect examination he testified as follows:

"Q. Now, Mr. Burke has asked you whether you intended to insure Henderson against anything but what was covered by the terms of the policy, and to that question you answered, 'No.' Now, I will ask you, Mr. Kepler, whether or not, knowing as you say you do, that Henderson wanted a policy that would protect his wife in case he met death at the hands of another, intentionally inflicted, you would have delivered to him such a policy as he received? A. Yes; I would have delivered the policy, because I thought it covered that."

Viewing the testimony of this witness as a whole, and giving full credence to his statements, the only reasonable conclusion deducible

therefrom is that he intended to make such a contract as was evidenced by the company's printed form of policy then in use and in his possession; that he had no intention of exceeding his authority or violating his instructions; and that such representations as he may have made to the assured concerning the risks covered by the policy were due to ignorance of its terms or to a misunderstanding of their legal effect. Kepler nowhere asserts that he entered into an oral agreement with Henderson to insure him against injuries inflicted intentionally by a third person, although he does say in substance, in his direct examination, that he supposed the form of policy then in use by the defendant covered that class of risks, and that he made representations to that effect, doing so honestly and without any intention of deceiving the assured. Such being the character of the evidence relied upon by the plaintiff, we think that it was insufficient to warrant a reformation of the policy.

It is true, no doubt, that a court of equity has power to reform an executed written contract which was intended to embody the provisions of a previous oral or written agreement, but which, through a mutual mistake of fact or a mutual misunderstanding of its legal effect, fails to express the intentions of the parties. It was so decided in Hunt v. Rousmanier, 1 Pet. 1, 13, and the doctrine has been approved in subsequent decisions by other courts. Oliver v. Insurance Co., 2 Curt. 277, 299, Fed. Cas. No. 10,498; Pitcher v. Hennessey, 48 N. Y. 415, 423; Palmer v. Insurance Co., 54 Conn. 488, 502, 9 Atl. 248; Maher v. Insurance Co., 67 N. Y. 283, 290, 291; Avery v. Society, 117 N. Y. 451, 460, 23 N. E. 3. But a court of equity will not reform a written agreement when, by so doing, it would impose on one of the parties obligations which he never intended nor agreed to assume. It is of the very essence of the rule that a mistake relied upon to secure the reformation of a written contract must be mutual, and that the contract as reformed must express the very terms of a previous agreement which the parties actually made and intended to reduce to writing. In the present case the proof shows that Kepler intended to make precisely such a contract as was embodied in the company's printed form of policy, and such a contract was in fact executed and delivered. He had no authority to make an agreement different from that expressed in the company's printed form of policy, nor was the company in the habit of insuring against other risks than those described in the policy that was actually issued, unless a higher rate of premium was paid than that paid by the assured. If Kepler acted under a mistake, it is evident that it consisted in failing to comprehend the class of risks that were covered by the policy; but a mistake of that kind, accompanied, though it may have been, by some misleading statements as to the risks covered by the policy, is surely not sufficient to warrant a reformation of the policy, especially where no fraud was practiced or intended to be practiced upon the assured. It frequently happens that knowledge of material facts communicated to the agent of an insurance company by the assured, either prior or subsequent to the issuance of a policy, has the effect of waiving particular provisions found therein or of estopping the company from claiming the benefit of such provisions; but where the

class of risks intended to be insured against is clearly described in the policy, and the assured has a full and fair opportunity to read the instrument, the company will not be bound by representations made by its agent, in good faith, that the policy covers risks that are not in fact within its provisions. Association v. Kryder, 5 Ind. App. 430, 31 N. E. 851; Casualty Co. v. Teter (Ind. Sup.) 36 N. E. 283. In construing the provisions of a written agreement and in determining its legal effect, the parties thereto act at arm's length if the agreement is couched in plain language and no fraud or deceit is practiced. It is the duty of a person, when he becomes a party to a written contract, to examine its provisions, and determine for himself what obligations and what liabilities it imposes, and, if need be, to seek legal advice on that subject. This duty is equally imperative when a policy of insurance is taken out; and courts of equity cannot undertake to reform such an instrument merely because the legal effect of its provisions was misunderstood by the assured, nor even on the ground that an agent of the insurer erroneously represented that the policy covered risks which the language of the instrument clearly shows that it did not cover, if the agent acted honestly, without artifice or any intent to defraud.

In accordance with these views, the decision of the circuit court of the United States for the district of Wyoming is reversed, and the cause is remanded to that court, with directions to dismiss the bill of complaint.