*45 — 570*
*55 — 33 6*

# DESERET NATIONAL BANK, RESPONDENT, *v.* HENRY DINWOODEY, W. S. BURTON ET AL., APPELLANTS.

EQUITY—WRITTEN GUARANTY—ACTION TO REFORM—PRESUMPTION— BURDEN OF PROOF.

1. In an action to reform a written guaranty, if the proof as to the mistake is doubtful or unsatisfactory, the writing will be held to express correctly the intention of the parties.

2 *Reformation af Contract—Mutual Mistake.*
Equity will not reform a written contract unless the mistake is proved to be the mistake of both parties.

3. *Same—Evidence.*
The evidence necessary to establish a mutual mistake, and to warrant a court of equity in correcting a written instrument, must be such as to leave no reasonable doubt in the mind of the court as to the mistake. If the evidence is contradictory or uncertain, it is insufficient to support a decree for the reformation of a written instrument.

4. *Guarantee for Future Obligations.*
When a new note is given in renewal of another, it does not come within the terms of a written guaranty for future loans, when the original note was given before such guaranty.

5. *Mistakes in Law.*
A court of equity will not reform a written contract because of mistake of law, when the mistake was made with a full knowledge of the facts and without fraud.

(No. 888.   Decided April 11, 1898.).

Appeal from district court, Salt Lake county; Ogden Hiles, *Judge.*

Action by the Deseret National Bank of Salt Lake City against W. S. Burton and others. Judgment for plaintiff, and defendants appeal, defendant, Henry Dinwoodey, alone perfecting his appeal. *Reversed.*

*Moyle, Zane & Costigan,* for appellants.

*Le Grand Young, Dickson, Ellis & Ellis,* for respondent:

The expression that one of the courts has made and is quoted by counsel for appellant that, "that the allegation must be satisfactorily proven as if admitted is not the rule. It would be ridiculous to suppose such a thing, but it must, however, be satisfactorily proven." *Rector* v. *Collins,* 55 Am. Rep. 572; *Carnell* v. *Wilson,* 14 Ark. 487; *Hinkle* v. *Royal Exchange Insurance Co.,* 1 Ves. 317; *Ingram* v. *Childs,* I Bro. 94; *United States* v. *Munroe,* 5 Mason Ch. 577; *Gillespie* v. *Moon,* 2 Johnson 585; *Stockbridge Iron Company* v. *Hudson Iron Company,* 107 Mass. 290; *The Travellers' Insurance Company* v. *Henderson,* 69 Federal Cases, 765; *Andrews* v. *Insurance Company,* 3 Mason, 6 Fed. Cases, 374; *Snell* v. *Insurance Company,* 98 U. S. 85; *Simons Creek Coal Company* v. *Duran,* 142 U. S. 435.

The only question is the degree of the proof required; and the cases of *Pitcher* v. *Hennessy,* 48 N. Y. 415; *Laning* v. *Carpenter,* 48 N. Y. 409; *Camdy* v. *Marsy,* 13 Gray 373; heretofore cited upon respondent's brief, show distinctly and practically what class of evidence is required to cause a court to reform an instrument for either a mistake of law or fact; for it requires no stronger evidence in one case than in the other. The court should adopt the construction which, under all the circumstances of the case, ascribed the most reasonable, proper, and natural conduct of the parties."

In the case of *Lawrence* v. *McCalmont,* 2 Howard; *Doug-*

*lass* v. *Reynols,* 7 Peters, 112-122; *Drummond* v. *Prestman,* 12 Wheat. 515, 518, and 519; Fell on Guaranty, Chap. 5, 129, etc; *Mason* v. *Pritchard,* 12 East 227.

In this case there can be no question but that the giving of these new notes in May and April with endorsers upon them and the surrender of old indorsed notes to the makers marked paid was intended by both makers and payee to end the old contracts made by the old notes and the creation of a new debt made by the new notes, and the fact that the old notes have ever since that time been in the hands of the makers, and they have never been asked to renew or indorse the new paper, is conclusive evidence of the intention of the parties. See also *Barnett* v. *Reed,* 51 Penn. State, 190; *Lyman* v. *Bonk,* 12 How. U. S. 525; 2 Parsons on Contracts, 624; 2 Greenleaf on Evidence, sec. 519.

It cannot be said that we run counter to the precedents in holding the letter now before us to be of continuing guarantee. *Crittendon* v. *Fisk,* 41 Am. Rep. 146; *Menard* v. *Scudder,* 56 Am. Dec. 610; *Lowe* v. *Beckwith,* 58 Am. Dec. 659; *Gates* v. *McKee,* 64 Am. Dec. 545; *Hotchkiss* v. *Barnes,* 91 Am. Dec. 713.

JOHNSON, District Judge:

This action was originally brought to recover upon a written guaranty made by the defendants to the Deseret National Bank of Salt Lake City of which the following is a copy:

"SALT LAKE CITY, Utah, March 17, 1892.

"For value received, we or either of us promise to pay to the Deseret National Bank of Salt Lake City any and all sums of money which the said bank may loan or advance to the Burton-Gardner Company upon notes, or on their accounts, to the amount of $25,000, and with inter-

est on said loans or advances from the time the same are made, respectively, at the rate of ten per cent. per annum, until paid; said payment to be made upon demand.

"W. S. Burton.            Elias Morris.
"L. G. Hardy.            W. C. Burton.
"E. M. Weiler.           O. H. Hardy.
"Henry Dinwoodey."

Three amended complaints were afterwards filed, based upon the express writing of the written guaranty set out in the original complaint. Demurrers thereto were sustained, and the fourth amended complaint, upon which the trial was had, was filed August 31, 1895. The theory upon which the original and three amended complaints were based, was that the written guaranty covered past, as well as future, indebtedness of the Burton-Gardner Company. In this fourth amended complaint the plaintiff seeks to reform the written guaranty, above set out, so as to make it cover past indebtedness, represented by two notes of the Burton-Gardner Company, for $20,000, which were indorsed by all the defendants, except the appellant, Dinwoodey, as well as future loans and advances thereafter made by the bank to the Burton-Gardner Company. This reformation is asked for on the ground of mutual mistake on the part of the plaintiff and defendants, and each of them, as guarantors of the paper. The trial court reformed the written guaranty as prayed for in the complaint, and rendered judgment against the defendants for prior indebtedness, as shown by the two notes of $10,000 each, which had been renewed by making new notes of the Burton-Gardner Company for advances made after the guaranty was executed. From this judgment the defendants appeal to this court.

The defendants filed their answer, in which they denied all the material allegations of the complaint, except the

corporate existence of the plaintiff and the Burton-Gardner Company, and admit the execution of the writing described in the complaint, and their liability thereon to the extent of all future loans and advances made after its execution, and deny that it was intended by either party to cover past indebtedness of the Burton-Gardner Company, and allege that all such advances and loans have been fully paid by said Burton-Gardner Company to plaintiff; deny that there were any actual mistakes in the execution of said instrument; and deny specifically all the other allegations of the complaint. Henry Dinwoodey only has perfected his appeal, and therefore this appeal will only be considered so far as it concerns him. He appeals from the judgment of the lower court upon questions of both law and fact.

It is contended by respondent that, at the time of the execution of the written guaranty by appellant, viz.: March 17, 1892, the Burton-Gardner Company was indebted to respondent in the sum of $20,000, upon two certain promissory notes, not yet due; and, desiring to borrow more money from respondent, the appellant executed the guaranty in suit to secure the payment of such back indebtedness, as well as all future advances to be made to said Burton-Gardner Company, not, however, to exceed $25,000; and, by inadvertence and mutual mistake of the plaintiff and defendants, the said guaranty failed to state specifically and in terms said indebtedness covered by said two notes; and they ask that, by a decree of the court, said guaranty be so reformed and corrected as to cover said two notes, the past indebtedness of the said Burton-Gardner Company to respondent, as well as future advances to be made, as they say was the true agreement, understanding, and intention of the parties. This is denied by the appellants, and they say that the guaranty was

not intended to cover said two notes or any back indebtedness, but only future advances and loans to be made. This brings us to the consideration of the evidence upon that question.    The law upon this point, we think, is correctly stated by Justice Miner in the case of *Ewing* v. *Keith*, **16** Utah **312**, wherein he says:    "In such case the burden rests upon the moving party of overcoming the strong presumption arising from the terms of the written instrument.    If the proofs-are doubtful or unsatisfactory, if there be a failure to overcome this presumption by testimony entirely plain and convincing beyond reasonable controversy, the writing will be held to. express correctly the intention of the parties."    2 Pom. Eq. Jur. § 859; Adams, Eq. pp. 170, 171:    In the case of *Chambers* v. *Emery*, 13 Utah 392, Justice Bartch says:    "If it were once established that the effect of the terms of a written instrument could be avoided by a bare preponderance of parol evidence, the gates to perjury would soon be wide open."    To the same effect are 1 Jones, Mortg. § 252; *Howland* v. *Blake*, 97 U. S. 624; *Snell* v. *Insurance Co.*, 98 U. S. 85; *Coal Co.* v. *Doran*, 142 U. S. 417; *Insurance Co.* v. *Henderson*, 16 C. C. A. 390, 69 Fed. 762.    Numerous other authorities might be cited to the same effect.    Equity will not reform a written contract unless the mistake is proved to be the mistake of both parties.    *Demond* v. *Providence, etc., R. Co.*, 5 R. I. 130.    In this case, Aimes, C. J., says:    "A court of equity has no power to alter or reform an agreement made between parties, since this would be in truth the power to contract for them, but merely to correct the writing executed as evidence of the agreement, so as to make it express what the parties actually agreed to.    It follows that the mistake which it may correct in such a writing must be, as it is justly expressed, a mistake of both parties to it; that is, such a mistake in the drafting of the writing as

makes it convey the intent or meaning of neither of the parties to the contract.   If the court were to reform a writing to make it accord with the intent of one party only to the contract, who averred and proved that he signed it as it was written, by mistake, when it actually expressed the agreement as understood by the other party, the writing when so altered would be just as far from expressing the agreement of the parties as it was before, and the court would be engaged in the singular office for a court of equity of doing right to one party at the expense of precisely equal wrong to the other." See, also, 15 Am. & Eng. Enc. Law, 647.   The evidence necessary to establish a mutual mistake, and to warrant a court of equity in correcting a written instrument, must be such as to leave no reasonable doubt in the mind of the court, and when the mistake is denied in the answer the proof must be strong to overcome such denial.   If the evidence is at all loose, confused, contradictory, or uncertain, it is insufficient to support a decree for the reformation of a written instrument.   See 5 Am. & Eng. Enc. Law, 650.   This doctrine is supported by an overwhelming line of authorities.   This, then, being the law upon this subject, let us look into the evidence in this case, and see if it follows this requirement.

H. S. Young, a witness for the plaintiff, testified, in substance, as follows:   "Dinwoodey said he would not indorse the notes of the Burton-Gardner Company.   At another time he said he would sign the notes.   At another time Dinwoodey said to go ahead and get judgment, and he would buy the judgment; told me to figure up the amount of the Burton-Gardner Company's debts, and draw a note for a long time, and at a low rate of interest, and he would sign it.   I drew the note, and he said he wanted to see the other directors of the Burton-Gardner Company and

17 UTAH—4

have them sign the note with him.  On March 16 or 17, 1892, he came to me to get more money for the Burton-Gardner Company.  He said he would sign the guaranty; that the company needed some more money.  I asked him if he would sign the guaranty for the whole amount,—the twenty-five thousand,—and he replied he would."

W. S. Burton, a witness for the plaintiff, testified, in substance, as follows: "Dinwoodey said he would sign the Burton-Gardner Company notes.  I told Dinwoodey that we needed more money, and could get it at the Deseret National Bank, if all the directors would sign the guaranty.  He first declined, and then signed the guaranty.  I told him that we would have to have some more money, and he agreed that he would sign with the other directors of the Burton-Gardner Company in getting that money. I called on Dinwoodey, and handed him the guaranty.  He read it, handed it back, and declined to sign it.  I did not explain the paper to him.  He read it himself.  Afterwards, in company with L. G. Hardy, I told Dinwoodey that we must have some more money.  I said, 'The bank will advance the amount required, if you will sign this paper with us;' and he then signed the guaranty.  He (Dinwoodey) told me on several occasions that he would not sign for the Burton-Gardner Company, and afterwards said he would.  I did not tell any of the defendants that the guaranty was to cover back indebtedness of the Burton-Gardner Company.  I took the guaranty to them to sign, for the purpose of getting more money from the bank. There never was any meeting of the board of directors at which any concurrent action was taken relative to the guaranty."

L. S. Hills, a witness for the plaintiff, testified, in substance, as follows: "Dinwoodey came to the bank, and

wanted the bank to get judgment against the Burton-Gardner Company, and he would buy it. I drew the written guaranty, and it contained all that I intended that it should contain."

John C. Cutler, a witness for the plaintiff, testified, in substance, as follows: "Dinwoodey agreed to sign the note for the whole amount that the Burton-Gardner Company was owing, if he could get a long-time note and low interest. When the written guaranty was brought out by Mr. Young, Mr. Dinwoodey said: 'I am liable for it; I am liable for that, and will have to protect it.' "

James T. Little, a witness for the plaintiff, testified, in substance, "that at a meeting of the board of directors Dinwoodey said he would give a note for the amount of the Burton-Gardner Company notes, if it was for a long time and a low rate of interest. The guaranty was there. I do not remember the exact language used by Dinwoodey on that occasion."

Leonard G. Hardy, a witness for the defendant, testified, in substance, as follows: "I first heard of the guaranty (Exhibit A) some time in March, 1892. I came into the bank one day (it would be some time about the 17th of March), when Mr. Young handed me that guaranty, and asked me to sign it. That was the first time I had ever heard of it in that shape; had heard of it, but in a general way. We talked about getting securities for the company, but no definite plan had ever been devised in the matter. This was the first time I had ever heard of this particular guaranty. The first time I ever saw it, Mr. Young asked me to sign it, that they might have the paper there, to avoid running around to get signatures every time the company wanted to borrow money. Nothing at all was said about past notes. He simply spoke of the company desiring to get money, and this was for that pur-

pose. The money referred to was the borrowing of money to carry on the business of the company. I don't remember just the amount the company was then wanting to get; it was between two and three thousand dollars. I know they were wanting that for immediate use. The manager of the company wanted it for the company. The money was wanted to carry on the business of the Burton-Gardner Company. I signed the guaranty after Mr. Young had made this statement. I saw the guaranty again in the hands of W. S. Burton. He came to me, and requested me to accompany him to Mr. Dinwoodey's office to get him to sign the guaranty. I went with him. I explained it to Mr. Dinwoodey. I went to Mr. Dinwoodey's office with Mr. Burton. Mr. Burton said to me, as a reason for my going to Mr. Dinwoodey, that he couldn't get Mr. Dinwoodey to sign the guaranty, and he asked me to go with him and talk with Mr. Dinwoodey in regard to signing it. I told Mr. Dinwoodey (we were all there, Mr. Burton, Mr. Dinwoodey, and myself) it was necessary for the company to have some more money to carry on the business with. We then had heavy contracts for the First Congregational Church, on the corner of Fourth East and First South, and the hospital up there by the Warm Springs, and several other contracts; and we explained to Mr. Dinwoodey that the bank wanted a general guaranty from all the directors for what money they would advance the company to carry on this business with. When I explained that the bank would not advance the money unless we all gave a general guaranty for the same, Mr. Dinwoodey, on this explanation, agreed to sign. I explained that we had then in the neighborhood, outside of these contracts, nearly $60,000 due on the books of the company, for work that had already been done, and that this guaranty would be in the nature of a temporary guaranty. Mr. Dinwoodey had re-

fused to sign any notes in the matter, and we believed at that time that the debts due and owing to the company were good; that they were largely in excess of the amount we were then owing the bank, and what we would be liable to want on this guaranty, but before we could get final payments on these contracts we would have to go ahead and do certain work. Q. And had to have money to complete them? A. Yes, sir. Mr. Dinwoodey finally signed the paper,—the guaranty."

W. S. Burton, recalled by defendants, testified, in substance, as follows. "I took the guaranty around to part of the signers personally. When I presented it to the defendants, with the exception of Mr. Dinwoodey and L. G. Hardy, I don't think there was anything said with regard to the amount of money we wanted to obtain. I had previously told them that we wanted to borrow $2,500 more. I don't think there was anything said as to the amount to be borrowed. I simply told them I wanted to get some more money, and that they had to sign the paper before I could get it. I had told them before that I wanted about $2,500 at that time. I told them at this particular time I wanted to get $2,500, and I had to explain to them that there was large contracts on hand."

Elias Morris, a witness called for the defendants, testified, in substance, as follows: "W. S. Burton didn't, at any time prior to March 17, 1892, say to me, or in my presence, that the Deseret National Bank was in any way dissatisfied with the security they then had for the indebtedness of the Burton-Gardner Company at any time. I never heard of the written guaranty (Exhibit A) until Mr. Burton came around with the paper to be signed. I think I signed it the same day he brought it. I didn't converse with any one except W. S. Burton before signing it. He said that we were very short of means or funds to go on

with the contracts that we had, and that we were bound to get some more to go through with them. I questioned him a few things with regard to the contracts that they had, and he stated they could not get a settlement until they completed the contracts, and that they were bound to carry on their work and complete them. I questioned him what he wanted the money for, and he gave me his reasons in a few words, and I expected all to sign it alike, and I signed it. Mr. Burton, in speaking about the amount, said the document was to enable them to draw on just what they wanted. My best recollection is that they wanted an open account there, to draw as they wanted; that they wouldn't get it unless we signed that agreement. Not a word was said about back indebtedness on the old note; not a word was said about surrendering the old note; not a word about discharging me from my liabilities on the old note. I didn't think I was going to be obligated for anything more than what the document itself purported at the time I signed it. Mr. Dinwoodey never agreed in my presence, and never said in my presence, that he would sign the company notes."

Henry Dinwoodey testified, in substance, as follows: "The first time I saw Exhibit A was in March, 1892. I first heard of it when it was presented to me, some two or three days before I signed it. W. S. Burton presented it to me. I told Mr. Burton, after I looked at it and read it, that I didn't want to sign it. I didn't want to be mixed up with the affairs at all, and I said that I wouldn't sign it. He told me that he wanted to raise some money to finish some contracts that they had under way, and that that was the reason he wanted me to sign it. He didn't state any specific amount of money that he wanted. I think that was all the first conversation. I saw Exhibit A again two or three days after. W. S. Burton and L.

G. Hardy were present then.   L. G. Hardy came to ask me if I would sign that guaranty.   I said that I had refused to sign it.   Then he went on to explain that they wanted money to finish large contracts they were doing, and they could not finish them without it, and they wanted the guaranty for an advance to finish them.   I was in the store when they came to see me, occupied with some customers there talking.   I was engaged in this last conversation ten or fifteen minutes.   Through the pressure of Mr. Hardy, and his telling me it was a temporary loan, and they had a large contract, and they would soon have the money returned to them, and because W. S. Burton stood there and said, 'We will not be long, but what we will get it,' but that they couldn't get it without I signed,—on those conditions I agreed to sign, and did sign.   There was not a word said about back indebtedness, or other indebtedness; not a word said about old notes; not a word said about the guaranty securing notes that the company had previously given for indebtedness they had already incurred.   Neither Mr. Burton nor Mr. Hardy, in that conversation, said to me that I had previously agreed to sign for the company.   I never had agreed to sign the Burton-Gardner Company paper to the Deseret National Bank. I had always refused to sign it.   I never told Mr. Burton that I would sign the Burton-Gardner Company paper. Mr. Burton never, at any time prior to the time when the guaranty was presented to me, said that the bank would not loan any more money or renew any more notes unless they had all the directors sign.   Mr. Burton may have talked to me about the condition of the Burton-Gardner matters, but the particulars I could not tell.   I don't remember that he ever said that the bank had to have more security or additional collateral.   Mr. Hyde Young never asked me to indorse any notes of the Burton-Gardner Com-

pany. The conversation that Mr. Young testified to never happened. That conversation Mr. Young said was as follows: 'I told Mr. Dinwoodey that Mr. Burton had told us that the directors had met together, and the situation had been laid before them as to the loan of the Deseret Bank, and that Mr. Burton reported to us that all the directors, including himself, had agreed to sign to the bank for the amount of their indebtedness, if we would carry it along further. I asked Mr. Dinwoodey to confirm that, and to say whether it was correct or not; and he said, "Yes," he had had Mr. Burton get up a statement, which he hadn't seen in the time previous, and, after looking it over carefully, he had concluded that by getting more time they could pull through, and he decided to sign that with them for the indebtedness to the bank. We already had six of the other directors.' That conversation never took place between Mr. Young and me. I never said to Mr. Young that I would sign with the others, referring to anything other than the written guaranty. I never talked with Mr. Young about signing this written guaranty at all before I signed it. I never told Mr. Young at any time that I would guarantee the payment of the Burton-Gardner paper. I never at any time, before or after the guaranty, told him that I would guarantee the paper of the Burton-Gardner Company. Col. Ellis: We don't claim that Mr. Dinwoodey ever agreed to guarantee the paper of the Burton-Gardner Company. Witness (continuing): I never told H. S. Young, cashier of the plaintiff, that I had told Mr. Burton that I would guarantee the indebtedness of the Burton-Gardner Company to the bank, and I never told Mr. Burton that I would do so. After consulting with Mr. Moyle, I went to Mr. Young, and told Mr. Young that I considered myself liable for the money advanced to finish those contracts, and that I was very anxious that suit

should be pushed forward as quickly as possible. Mr. Young asked me if I would sign a note covering that, and I told him, 'No.' I didn't understand at the time I signed this guaranty that it was to cover back indebtedness. Nobody ever said to me, prior to my executing that guaranty, that it was designed to cover back indebtedness. Mr. Cutler's statement that in March, 1892, I conceded or admitted my liability for all the Burton-Gardner Company indebtedness, is not true. I simply conceded by liability on the guaranty for the advanced money. That's where they make the mistake. I always conceded my liability, whatever it was, for the money advanced on that guaranty; and when I spoke of my liability I referred to the money that was advanced by the Deseret Bank to finish those contracts, on this guaranty. I spoke quite a number of times to Mr. Lewis S. Hills about the bank proceeding as speedily as possible to procure a judgment on this guaranty, and he said he would speak to his attorney and have the matter pushed; it was dragging along. I also spoke to Mr. H. S. Young that I would like it pushed. If the defendants in this case ever met and agreed at any time to guaranty the paper,—that they would all guarantee the paper of the Burton-Gardner Company,—I didn't hear it. I wasn't there. They never did so when I was present, or to my knowledge. I never went to the bank and solicited a loan for the Burton-Gardner Company. I never in any way induced, or sought to procure, a loan from the bank to the Burton-Gardner Company. I never said to Mr. H. S. Young that I would sign the guaranty for $25,000 before I signed it. I never had any talk with Mr. Young about signing this guaranty before it was signed. I never said to him that I would sign the guaranty for $25,000 before it was signed. I never, at any meeting where Mr. Cutler or Mr. Smith or Mr. Little was present, stated that I would

give my note for the full amount of the indebtedness of the Burton-Gardner Company, or for any more than the amount that might be recovered on the judgment on this guaranty. I told them that I would give my note for the amount of the judgment that would be recovered, if they would reduce it to a less interest and a long time. They all heard that. I didn't, on or about the 18th of January, 1892, agree with the Deseret National Bank, or any one else, that if the bank would renew the old notes of the Burton-Gardner Company, and make some advance, that I would guarantee the indebtedness of the Burton-Gardner Company. I had no interest in the old notes or indebtedness. When I signed the paper I looked it over, read it carefully, and considered that I was making myself liable for any amount that they might draw from the bank thereafter, up to that sum. I didn't anticipate that they would draw to the amount of $25,000. · I think the first person to whom I made known my understanding about that was my attorney, a very short time after. I made it known to him after I signed the guaranty. After I signed Exhibit A, and before the suit, I didn't know, either approximately or exactly, the amount of money the Deseret Bank had advanced. I knew the Burton-Gardner Company could draw all it wanted to, and I don't remember that I knew exactly what they had drawn, up to the failure."

O. H. Hardy, a witness for the defendants, testified, in substance, as follows: "I first heard of this guaranty (Exhibit A) about the time it was presented, in March, 1892. Never heard of it before. It was probably three or four days before I signed it after I first heard of it. W. S. Burton presented it to me. He told me that it was for—he said that they wanted some money for immediate use; that they had some contracts that they wanted to finish, and they wanted some money to finish them with. I was al-

ready on a ten thousand dollar note,—a previous note,—
and I said to Mr. Burton: 'This will increase my liability
to thirty-five thousand if I sign this guaranty, and I ob-
ject to it, and I want you to get the signature of the other
directors or I won't sign;' and I didn't sign. He went
away, and came back, and says, 'They have all signed now
except you and Mr. Dinwoodey;' and I says, 'Will Mr. Din-
woodey sign?' and he says, 'I think he will.' 'Well,' I
says, 'now, look here, again; this will increase my liability
to thirty-five thousand if I sign it, and I object to it;' and
he says, 'Oh, no; it doesn't; that is simply for my use, and
it doesn't increase your liability on the note you are on;'
and I says, 'Well, with that understanding, and with Mr.
Dinwoodey's signature, I will sign.' He said again that I
was to sign this guaranty for money for immediate use,
to finish up some contracts that they had out. I didn't
understand that this written guaranty was to cover any
back indebtedness. I didn't understand that by signing
it I was to be released or relieved from the payment of the
ten thousand dollar note that I had already signed. I
understood that it was to be a liability in excess of that.
The reason he gave why it wouldn't increase my liability,
was, they only wanted a few thousand for immediate use.
Two or three thousand would be all that was necessary.
Of course, as a matter of fact, it would increase my lia-
bility, but he meant it wouldn't increase it very much. I
understood him to say that it would not increase my lia-
bility any further than temporarily; that they would get
their money on the contracts, and it would relieve us. Mr.
Burton gave me to understand when he brought the guar-
anty that it didn't increase my liability, if I signed that,
over and above three thousand dollars, as that was all they
wanted to use. That was the way I understood it."

It must be evident, from the above evidence, which is, in

substance, all the evidence on that subject, that there was no mutual mistake in the execution of said written instrument, and that to hold otherwise would be to create a new contract for the parties in terms which they never intended. This no court has the right to do. If there was any mistake in the execution, it was a mistake of law on the part of the bank, but such a mistake the law cannot relieve against. A mistake of law is an erroneous conclusion as to the legal effect of known facts, and it is laid down as a general rule, by a very large list of authorities, that such a mistake, unconnected with a mistake of fact, and where there are no indications of fraud, imposition, or undue advantage entering into the agreement, it will not be corrected by a court of equity. 2 Pom. Eq. Jur. §§ 842-847; 5 Am. & Eng. Enc. Law, 635; *Hunt* v. *Rousamanier,* 1 Pet. 1; *Trigg* v. *Read,* 43 Am Dec. 447; *Goodenow* v. *Ewer,* 16 Cal. 461; *Stoors* v. *Barker,* 10 Am. Dec. 316; *Bank of U S.* v. *Daniel,* 12 Pet. 32; *Loftus* v. *Fisher,* (Cal.) 39 Pac. 1065.

We are clearly of the opinion, therefore, that respondent is not entitled to have said written instrument reformed, either upon the theory of mutual mistake in its execution, or mistake of law, there being no fraud or deception charged in the pleadings, or attempted to be proven upon the trial, but that the parties must stand upon the instrument as it appears upon its face and the rights accruing therefrom.

This brings us to the consideration of the legal effect of the instrument and the rights accruing thereunder. Language, although not a perfect medium of thought or intention, is yet the most perfect which we possess. Whenever it is employed in any legal instrument it must be taken as the expression of the real intention or thoughts of the persons using it. If there shall be no ambiguity apparent,

the words must be taken in their usual and ordinary signification, and the context interpreted in accordance with grammatical rules. When, therefore, a person has clearly expressed one thing in his contract, no court has the right to say that something else was intended, when the language employed is clear and free from ambiguity, and courts are bound by it, and cannot look beyond it for motives and intentions not expressed. To place the interpretation upon the contract sued upon in this case, which counsel for respondent contends for would, in our opinion, be to ignore entirely the language employed by the parties, and make an entirely new contract for them.

Tested by the above rules, what are the terms of the contract? It says: "For value received, we, or either of us, promise to pay to the Deseret National Bank of Salt Lake City any and all sums of money which the said bank may loan or advance to the Burton-Gardner Company upon notes, or on their accounts, to the amount of $25,000, and with interest on said loan or advances from the time the same are made, respectively, at the rate of ten per cent. per annum until paid; said payment to be made upon demand." Can any person say that there is a word in said instrument that makes the slightest reference, directly or indirectly, to any past transaction? To do so, it seems to us, would be to entirely disregard all rules of interpretation. We must therefore hold that, under the written instrument, the appellant was liable only for loans and advances made to the Burton-Gardner Company after the execution of the instrument, and not for pre-existing debts, in accordance with the terms of the contract.

But it is contended that respondent's Exhibits F and G, being two promissory notes of the Burton-Gardner Company to respondent bank, for $10,000 each, dated April 17, 1892, and May 16, 1892, respectively, were new loans or

advances made by the respondent to the Burton-Gardner Company after the execution of the guaranty, and therefore they are included within the terms of the guaranty. Let us examine this matter for a moment. On the 17th day of March, 1892, at the time the written guaranty was executed, the Burton-Gardner Company was indebted to the respondent bank in the sum of $20,000, as evidenced by two certain promissory notes of $10,000 each, and dated January 18, 1892, and February 16, 1892, respectively. These were renewals of other notes previously given for like amounts at the maturity of the same, which seems to have been the course of business dealings between the respondent bank and the Burton-Gardner Company. The note of January 18, 1892 (Exhibit B), matured April 17, 1892, and on that day said note was renewed by a new note for like amount (Exhibit F); the note dated February 16, 1892 (Exhibit D), matured May 16, 1892, and was on that day renewed by a new note for a like amount (Exhibit G); and so on, from time to time, as these notes matured, they were renewed by other notes of like amounts. There was no further advancement of money or any new loans at the time of such renewals. The question, therefore, presented for our consideration is, were the renewals of these notes new loans or advances, so as to be included within the terms of the written guaranty (Exhibit A)? Daniel on Negotiable Instruments says: "A party bound to make a payment has no right to do so in any other medium than that expressed on the face of the instrument; that is, he must make the payment in money." 2 Daniel, Neg. Inst. § 1245. Again, the same author says, in section 1260: "Let us consider the case when the debtor gives his own bill or note for or on account of a precedent debt. It is a general principle of law that one simple executory contract does not extinguish another for which it is substituted, and

negotiable securities form no exception; and by the general commercial law, as well of England as of the United States, a bill of exchange drawn or promissory note made by a debtor does not discharge the preceding debt for which it is given." And then the author cites a large line of authorities. Continuing, he says: "Unless such be the agreement of the parties, a creditor may return the bill or note when dishonored by non-acceptance or non-payment, and proceed upon the original debt. The acceptance of the instrument by the creditor is considered as accompanied by the condition of its payment. Thus, it was said in the time of Lord Holt: 'A bill shall never go in discharge of a precedent debt except it be part of the contract that it shall be so.' Such has been the rule in England ever since, and it proceeds upon the obvious grounds that nothing can be justly considered as payment in fact but that which is in truth such; and that a mere promise to pay ought not to be regarded as an effective payment is manifest." Continuing, the author says: "When a new bill or note is given in renewal of another bill or note, and the original is retained, the new bill or note operates only as a suspension of the debt evidenced by the original, and is not a satisfaction of it until paid. Such, at least, is the weight of authority." Section 1266. Continuing, at section 1266a, he says: "The delivery or surrender to the maker of the old note, upon its being renewed, does not in itself raise the presumption of its extinguishment by the new, it being considered as a conditional surrender, and that its obligation is restored and renewed if the new note be not duly paid; and the same rule applies when the new note has been carried to judgment, but without satisfaction." Numerous other authorities hold to the same effect.

The evidence in this case discloses no express agreement between the parties binding the appellant upon this sub-

ject, and we are of the opinion that the two notes, of $10,-000 each, the indebtedness of the Burton-Gardner Company to respondent, existing at the time of the execution of the written guaranty by appellant, although evidenced by renewed notes from time to time, was not paid by such renewals, but was a continuing, existing debt, and its enforcement only was suspended by such renewals. If we look at the object and intention of the appellant at the time he executed the guaranty, as expressed by him, we may find the key to the situation. The Burton-Gardner Company had in Salt Lake City numerous large and unfinished contracts, aggregating $60,000. It needed more money with which to complete these contracts. This money could be obtained by appellant signing the guaranty. It was an advance of money desired with which to complete these contracts, and not a discharge of past or pre-existing indebtedness.

Numerous other errors are complained of, but their determination is unnecessary. The findings, judgment, and decree of the lower court reforming the contract, and entering judgment against the appellant, are reversed and set aside, and the case is remanded to the trial court, with directions to said court to make an accounting between the parties, and ascertain the amount of money advanced on notes, overdrafts, or otherwise by the bank to Burton-Gardner Company at and subsequent to the date of the making of the written Exhibit A by the appellant, Dinwoodey, on March 17, 1892, together with the interest thereon, and to render judgment against said appellant, Dinwoodey, for such amount found due, in accordance with this opinion, together with costs of this appeal; and the court below will assess its costs as it may seem proper in the premises.

MINER, J.  I concur in the judgment.

ZANE, C. J. (concurring as to the conclusion of the court, except as to the taxation of costs.)

The plaintiff claimed about $4,000 advanced to Burton-Gardner Company after the execution of the note or guaranty described in the opinion of the court, and $20,000 advanced to that company before that time.  The defendant Dinwoodey offered to pay the advancement made after the execution of the guaranty, but refused to pay the $20,-000 advanced before.  The court below held on demurrer that Dinwoodey was not bound by the guaranty to pay the last-named sum, and the plaintiff amended its complaint, alleging a mutual mistake in drawing the guaranty, and that it was intended to cover the advances before its date as well as after.  This Dinwoodey denied, and the court entered a decree reforming the guaranty, and entered judgment against Dinwoodey for the $20,000 as well as the amount of the advancements after the execution of the guaranty.  To reverse the decree reforming the guaranty and the judgment as to the $20,000, Dinwoodey appealed, and this court reversed the decree reforming the guaranty and the judgment, so far as it included the $20,-000, and directs the court below to enter judgment only for the amount of the subsequent advances.  The appellant succeeds on his appeal, and yet the opinion of the court taxes the costs of the appeal against him, amounting to about $300.  This I believe to be wrong.  Those costs should have been taxed against the plaintiff, the party defeated.  Dinwoodey could only get rid of the $20,000 by the appeal.