ASHWORTH et al. v. CHARLESWORTH et al.

No. 7499.   Decided May 29, 1951.   (231 P. 2d 724.)

See 11 C. J. S. Bridges, Sec. 35. Inadequacy of contract prices as excusing performance. 12 Am. Jur., Contracts, Sec. 437.

*Richard L. Bird, Jr.*, Salt Lake City, for appellant.

*Harry D. Pugsley*, Salt Lake City, for respondent.

LATIMER, Justice.

This is an appeal by the defendants from a judgment of the lower court awarding damages, attorney's fees and costs to plaintiffs for defendants' breach of contract for the painting of a bridge. The parties are referred to as they appeared in the court below.

Plaintiffs are partners, engaged in erecting and constructing steel structures— doing business under the assumed name of Utah Crane and Erection Company. Their principal place of business is located in Salt Lake City, Utah. Defendants are also partners, doing business as painting contractors, with their places of business in Ogden and Salt Lake City, Utah.

In the spring of 1947, plaintiffs were awarded a subcontract by a general contractor, under the terms of which plaintiffs were to unload, deliver to site, erect, and paint all the structural steel for the Green River bridge. This was a Utah State Road Commission project and there were detailed plans and specifications for its erection and completion.

In the fall of 1947, plaintiffs invited at least three painting firms, one of which was the defendant partnership, to submit bids on the painting of the bridge. The invitation to defendants was extended in September, 1947, by one Lyle Larsen, general superintendent of plaintiff partnership, who was supervising the construction of a hangar in Ogden for defendant Jack G. Charlesworth. At that time, Larsen told Charlesworth that plaintiffs had a contract to construct and paint the bridge at Green River and asked if defendants would be interested in submitting a bid. A few weeks later Charlesworth was in plaintiff's office in Salt Lake City and Larsen had the blueprints of the bridge on his desk. He told Charlesworth that they were the plans for the bridge which the parties had previously discussed. According to Larsen's testimony Jack Charlesworth then examined the plans, while Charlesworth testified that he merely glanced at them. Toward the latter part of September, 1947, Larsen called Jack Charlesworth in Ogden and asked what his price would be for the painting of the bridge. Charlesworth said he would call Larsen back and give him a price. Charlesworth then discussed the matter with his father, called Larsen, and, over the telephone, gave a price of $500 for the work. On October 3, 1947, Jack Charlesworth caused a letter to be sent to plaintiffs in which he submitted a bid for the painting of the bridge with two coats of aluminum paint, for the sum total of $500, adding that if the paint was to be furnished by the painting contractor the total sum would be $600. Plaintiffs received two other bids on the job, one in the amount of $2,000 and the other in the sum of $3,277. However, the one for $2,000 was not received by plaintiffs until after the contract with defendants had been executed.

After receipt of defendants' telephonic bid, plaintiffs prepared a contract which was signed by Jack Charlesworth

on October 15, 1947. The terms, insofar as pertinent here, are as follows:

"Whereas the undersigned painting contractor has examined the plans, specifications and drawing of that certain bridge being erected at Green River, Utah, by J. B. Roland and T. C. Roland, as general contractors; and

"Whereas, party of the first part, as sub-contractor has undertaken the painting of said bridge and the undersigned painting contractor has tendered his bid in the amount of $500.00 for the application of two coats of aluminum paint thereon;

"Now, therefore, in consideration of the premises and the covenants herein contained, the undersigned painting contractor agrees to apply two coats of aluminum paint to said new bridge at Green River, Utah, in accordance with the plans, specifications and drawings thereon provided by the Utah State Road Commission, which said plans, specifications and drawings the undersigned painting contractor has examined and is familiar therewith; said paint shall be applied in the manner and at the times to be directed by the general contractor and the said general contractor shall furnish the paint to be applied thereon.

＊　　＊　　＊　　＊　　＊　　＊

"In the event the work to be done by the painting contractor fails to comply with the said plans and specifications or is not done in a prompt, expeditious and good workmanlike manner thus requiring additional expenditures of labor or causing delays to the first party or the general contractor then the undersigned painting contractor shall promptly reimburse the first party for all expenditures of time and labor occasioned thereby; and in the event of any such failure on the part of the undersigned painting contractor it is agreed that they shall pay all costs, including a reasonable attorney's fee for collection thereof."

The erection of the bridge was completed before Christmas in 1947, and some time in February, 1948, plaintiffs advised defendants that the bridge was ready for painting and that defendants were to proceed with their contract. On one occasion during February or March, 1948, defendants sent a painting crew to the site to paint the bridge. Again in the latter part of March a crew accompanied by Jack Charlesworth went to the site of the bridge to commence the painting. On both occasions they failed to do any painting and on March 28, 1948, Jack Charlesworth advised plaintiffs that defendants would not perform the

contract. On April 2, 1948, defendants sent a letter to plaintiffs repudiating the contract. They did not assert in the letter the principal defense relied on in this court, but gave as their reasons for refusing to comply with the contract that the agreement was never approved or executed by plaintiffs; that Larsen was not authorized to make representations in behalf of plaintiffs; that Jack Charlesworth was not authorized to sign in behalf of defendants; that Larsen fraudulently misrepresented the facts regarding the size of the bridge, in stating that the scaffolding used in the erection of the bridge would be available for the painters, in representing that the bridge could be painted before the roadway was laid across it, and in promising that the bridge would be cleaned prior to the painting; and that plaintiffs had breached the contract in that they had failed and refused to furnish paint for the bridge.

After defendants' repudiation, plaintiffs were unsuccessful in obtaining another contractor to paint the bridge so that the work was performed by a crew employed by them at a cost of $2,196.45, resulting in a loss of $1,696.45.

In the trial court, defendants advanced several affirmative defenses, mostly involving their contentions that Larsen was guilty of fraud which induced them to execute the contract. In addition, they filed a cross-complaint in which they named Larsen as cross-defendant. They alleged in the cross-complaint that misrepresentations had been made by him as to the size and weight of the bridge, that he had assured them that the contract as prepared expressed the oral agreement of the parties, and that, relying on his statements, the contract was signed by Jack Charlesworth without checking the plans. The court found against the defendants on their cross-complaint, but no appeal has been taken from that judgment and the evidence sustains the trial court's finding that Larsen was not guilty of fraudulent conduct. These two items

can, therefore, be eliminated from further discussions.

On this appeal, defendants raise four points: (1) That a motion to dismiss should have been granted; (2) that the contract should have been set aside on equitable grounds; (3) that the amount of the judgment was excessive; and (4) that the award of attorneys fees was excessive. The first two contentions involve substantially the same equitable problem so we will consolidate them under one point.

Defendants argue that their bid was based upon a mistake—i. e., that they believed the bridge to be only 100 tons—that the disparity between their bid and the other received by plaintiffs was so great that plaintiffs knew or reasonably should have known from the amount of the bid that it was based upon a mistake; and that it is unconscionable to deny defendants relief under those circumstances. Defendants have cited several cases in which relief has been allowed because of a unilateral mistake. However, such relief has only been granted when the moving party has used ordinary diligence to prevent a mistake.

In a note to the case of *Hurst* v. *National Bond & Investment Co.*, 98 Fla. 148, 117 So. 792, 59 A. L. R. 807, the general rule is stated on page 809, as follows:

"Equitable relief from a mutual mistake is frequently given by a reformation of the contract. But a contract will not be reformed for a unilateral mistake. Equitable relief may, however, be given from a unilateral mistake by a rescission of the contract. Essential conditions to such relief are: (1) The mistake must be of so grave a consequence that to enforce the contract as actually made would be unconscionable. (2) The matter as to which the mistake was made must relate to a material feature of the contract. (3) *Generally the mistake must have occurred notwithstanding the exercise of ordinary diligence by the party making the mistake.* (4) It must be possible to give relief by way of rescission without serious prejudice to the other party except the loss of his bargain. In other words, it must be possible to put him in statu quo." (Emphasis added.)

*Williston on Contracts,* Sec. 1577, p. 4407, explains the effect of negligence on a contract as follows:

"Where the signer of a writing has made an innocent mistake as to the nature of his act without carelessness, whether induced by fraud or not, the writing is not his expression, and there is no contract. *But if a man acts negligently, and in such a way as to justify other in supposing that the terms of the writing are assented to by him and the writing is accepted on that supposition, he will be bound both in law and in equity. * * *"* (Emphasis added.)

And in Section 1596, on page 4447, the author states:

"It is frequently said that equity will not reform or rescind a contract if the petitioner has been guilty of negligence, or at any rate of gross negligence. That no such principle can be laid down as a universal rule is obvious. In many if not most cases of mistake in the expression of a contract where reformation is granted, there is some element of lack of care, but, at least, if the mistake is mutual and each party has been careless in failing to make a contract expressing the real intention of both, there seems no reason why relief should not. be granted, unless this is made inequitable by some change of position other than merely entering into the contract in question. *But if unilateral mistake, where there is no fraud or inequitable conduct, is ever to be regarded as sufficient ground for the rescission of a bilateral contract, there is more reason why a court of equity should confine its juridiction to cases where the party seeking relief has been free from negligence, since the blame of the situation lies wholly on the party seeking the relief. * * * *"* (Emphasis added.)

While the trial judge did not conclude as a matter of law that the defendants were guilty of negligence, his findings of fact show that ordinary care and diligence were not used by the defendants. To show that the evidence does not preponderate against the findings made on that issue, we relate some of the testimony which was before the trial court. The defendants were painting contractors of considerable experience; they knew that plans and specifications had been prepared for the particular job; they were able to read and interpret such plans; and no reasonable excuse appears to justify their failure to see and know what was clearly exhibited by drawings and specifications. In the early part of the preliminary negotiations detailed plans were submitted to them and the trial court found that Jack Charlesworth saw and had an oppor-

tunity to make a careful examination of them. The size, nature, weight and physical characteristics of the bridge appear on the plans, and the total weight was estimated in pounds. This latter item appeared on the first page of the drawings. After making an inspection of the plans and specifications, defendants were not rushed into submitting a bid. On the contrary, they were given ample time in which to carefully consider their contract price and to make any further inquiry or investigation desired by them. Several days expired between the time Jack Charlesworth looked over the plans and the time he was contacted over the telephone. Thereafter, the amount of the bid was discussed between the two defendants before they submitted their written offer to the plaintiffs. This offer was followed by the preparation of a formal written contract, which was submitted to the defendants for consideration and execution. The contract was written in understandable language and emphasized the fact that the defendants had examined the plans and specifications and were familiar with the drawings which, even though cursorily examined, pictured a substantial structure. There was no reason for defendants to certify they were familiar with the contents of the plans, if such was not true, and there is no evidence that plaintiffs concealed any necessary or desirable information or in any way induced defendants to believe that a careful scrutiny of the specifications was not necessary.

The defendant, Ben F. Charlesworth, was in charge of another painting contract in Colorado and drove past the site of the new bridge. No reason appears as to why this defendant did not see and know the size of the bridge prior to the signing of the contract. He testified that he drove over the bridge from early in 1947 until the bridge was completed. While this testimony is questionable in view of the time construction was started, the fair import of his testimony reflects that the bridge he crossed

was closely situated to the one involved in the litigation. Moreover, the defendants sent a crew to the site to paint the bridge late in February or early in March of 1948 and so the employees of the defendants were acquainted with the nature and extent of the undertaking. Some time later, in March of 1948, Jack Charlesworth went to the bridge with a second crew for the express purpose of completing the contract. It was some few days after this visit before any action was taken to repudiate the contract, and in the letter of repudiation no mention is made of the fact that the defendants made an honest mistake in estimating or computing the size of the bridge, their complaint being largely that Larsen had practiced a fraud upon them.

From the foregoing facts and circumstances, we are of the opinion that the findings of the trial court to the effect that there was no mistake is not contrary to the weight of the evidence. He could have reasonably concluded that the claimed mistake was an afterthought. But even assuming a mistake was made by the defendants, they were guilty of such carelessness in not seeing what they should have seen and in not obtaining readily available information that the trial court was not obligated to relieve them from the results of their own neglect. The fault, if any, in this case, appears to fall heavily upon the shoulders of the defendants.

Defendants seek to shift the responsibility to the plaintiffs because they claim plaintiffs were apprised of the mistake by the disparity in bids and were duty-bound to notify defendants. Admittedly, there is a wide variation between the offers submitted by the three bidders. But, in view of all the facts and circumstances, we cannot hold that the trial judge abused his discretion in denying defendants relief because of the claimed failure to disclose. Plaintiffs believed they were dealing with contractors who were competent to estimate

painting costs. They had not previously contracted for the painting of bridges and were unfamiliar with the manner or method of estimating the costs of that type of work. Plaintiffs knew that defendants had ample opportunity to examine the plans and specifications and had no reason to suspect that they, the defendants, would utterly disregard every ordinary business method and neglect or refuse to read the information which had been furnished them. When the contract was executed, plaintiffs were in possession of only one other bid. It was just as reasonable for plaintiffs to conclude that the high bidder was in error as to assume that the low bidder had made a mistake. The mere fact that two bids are at great variance does not compel a holding that the acceptor knows error has crept in and that he must notify the lowest bidder of the possibilities of a mistake. To hold otherwise would make one contracting party anticipate and guard against the negligence of the other.

Defendants further contend that the damages awarded by the trial court are excessive because they include the cost of labor and materials for painting a handrail, spot-painting rivets and cleaning the bridge. This contention must be sustained in part. The itemized expenses incurred by plaintiffs in painting the structure were put in evidence and the total amount expended was $2,196.45. This amount included the cost of all painting and some cleaning. Plaintiffs' evidence shows that the spotting of the rivets was done, for the most part, by the construction crew, and that the amount of time, if any, consumed by the painting crew in performing this work was negligible. Also, there was testimony that the bridge was not excessively dirty and that the painters merely had to scrape off small amounts of mud before painting. There being no evidence that defendants would not have been required to perform these minor incidental tasks under its contract, we do not believe that the trial judge was in

error for failing to deduct any amounts from the total damages for these two items.

The painting of the handrail presents a different problem. It is apparent that this item was not expressly mentioned in the contract signed by defendants, and in the preliminary negotiations plaintiffs' agent informed defendants that they could negotiate separately with the general contractor concerning the amount to be charged for this painting. Furthermore, plaintiffs recognized that this was not part of the contract by commencing an action against the general contractor for additional services performed, including painting of the handrail. The painting crew used by plaintiffs to paint the bridge also painted the handrail, and this item is included in the total amount of the expenses. There is no breakdown showing what portion of the total cost should be allocated to the painting of the handrail, but in the action commenced by plaintiffs against the general contractor this work is alleged to be worth the sum of $200. The complaint in that action was made an exhibit in the present case and is persuasive that defendants should not be assessed the costs of extra work. Since plaintiffs seek to recover $200 from the general contractor for painting the handrail, this amount should be deducted from the damages awarded to plaintiffs.

We overrule defendants' contention that the award made for attorney's fees was excessive. Both parties, in their pleadings, asked for attorneys' fees in the amount of $400. At the trial, counsel stipulated that they would submit no evidence on the value of the services, but would permit the court to determine what would be a reasonable fee. He found that $400 was a fair amount to be allowed and our attention has not been directed to any evidence indicating otherwise.

The case is remanded with directions to the trial court

to reduce the amount of the judgment by the sum of $200, and, as amended, the judgment is affirmed. Costs to respondents.

WOLFE, C. J., and McDONOUGH, J., concur.

WADE, Justice (concurring).

It seems that the defendant very negligently submitted a bid to do this work for about one-fourth of what the job would cost. There is no showing that plaintiffs could have gotten a better bid than the amount it cost them to do the job after defendants had refused to perform their contract. Nor is there any evidence that defendants in submitting such bid took a gamble on an uncertain proposition where there was a possibility of making a good profit, but also a danger that they would lose. Here it seems that from the beginning, and under all circumstances, the bid was only for a small fraction of the amount the job would cost. The plaintiffs have simply as a result of this contract been awarded the amount of this judgment without giving anything in return therefor, and the defendants have received no benefit or advantage as a result of their dealings with the plaintiffs. I concur with great reluctance.

CROCKETT, J., being disqualified, did not participate.