**GUARDIAN STATE BANK, a Utah corporation, Plaintiff and Appellant,**

v.

**F.C. STANGL III, Defendant and Appellee.**

No. 20158.

Supreme Court of Utah.

July 13, 1989.

**2**

Stephen B. Mitchell, Salt Lake City, for plaintiff and appellant.

Harold G. Christensen, George A. Hunt, Salt Lake City, for defendant and appellee.

STEWART, Justice:

Guardian State Bank ("Guardian") appeals a judgment against it on defendant Stangl's counterclaim.

Stangl was a fifty-percent shareholder in, and an officer and director of, Sargetis Fine Cars, Inc., a car dealership in Price, Utah, which Stangl co-owned with John Sargetis. In August, 1979, the dealership obtained a loan of $150,000 from Empire State Bank, the predecessor of Guardian. The dealership executed a promissory note (the "Sargetis note") for $150,000 payable on demand. Stangl and Sargetis executed continuing guaranties of all debts and obligations owed Guardian by the dealership.

The dealership made periodic payments until the spring of 1980 and then went out of business and assigned its remaining assets to the National Association of Credit Men ("NACM") as a trustee for the benefit of creditors. In April, 1981, Russell Webb, the president of Guardian, met with Stangl at Guardian's offices to discuss the delinquent loan. Webb told Stangl that as a guarantor he would have to pay the original note. Stangl responded that he could not pay the full amount at that time, but that he would pay the note. Stangl requested a repayment program whereby he would execute a new promissory note with one-half payable within either sixty or ninety days and the remainder payable within a year. Stangl observed that if he were simply to pay off the note, he might lose his right to recover by way of subrogation against the dealership on those assets held for liquidation by NACM. Although Stangl was advised by his attorney, Bruce

Maak, that he might have possible defenses to his liability on the Sargetis note and could elect to litigate his liability if he desired, Stangl requested Guardian to trade the Sargetis note for a new note that Stangl would issue so that he could collect on the dealership assets and possibly from Sargetis. Webb agreed to trade the Sargetis note for a new note from Stangl.

Thereafter, Maak and Guardian's attorney, Jerry Dearinger, met to effectuate the agreement between Stangl and Guardian. Maak requested that Guardian transfer its rights under the Sargetis note to Stangl upon Stangl's payment of the note. The transaction was to be structured as a purchase by Stangl of the Sargetis note. In May, 1981, Stangl paid Guardian $8,104, the interest then owed on the Sargetis note and executed a new promissory note (the "Stangl note") in favor of Guardian for $132,000, the unpaid balance of the Sargetis note. The Stangl note was to be repaid in two equal installments on July 10, 1981, and July 11, 1982. The note stated that Stangl gave Guardian the note for the purchase of the Sargetis note. Guardian assigned to Stangl the guaranty of the Sargetis note, indorsed the Sargetis note, and gave it to Stangl. Inexplicably, Guardian indorsed the Sargetis note in blank.

In trying to recover some of the dealership assets, Stangl discovered that Ford Motor Credit Co. had a blanket security interest on the assets of the dealership. As a consequence, he collected nothing from the dealership's assets. In 1982, Stangl made no payment on the Stangl note, and in the fall of 1982, Guardian demanded payment. Stangl refused to pay; instead, he presented Guardian with the Sargetis note and demanded that Guardian pay him the full amount of that note.

Guardian then filed an action against Stangl seeking to recover on the Stangl note. Stangl admitted liability on the Stangl note in his answer but filed a counterclaim alleging that he was entitled to recover the amount due on the Sargetis note. Guardian replied to the counterclaim by alleging mistake of fact and fraudulent

misrepresentation on Stangl's part in inducing Guardian to indorse the Sargetis note in blank. Guardian also filed a third-party complaint against the attorneys who handled the exchange of the Sargetis and Stangl notes, claiming that if Guardian was liable to Stangl on its indorsement of the Sargetis note, the attorneys were liable to Guardian for negligence. In addition, Guardian sought a declaratory judgment that it was not liable on the Sargetis note.

At the close of trial, Stangl and Guardian both moved for directed verdicts on the issue of Guardian's liability on its indorsement of the Sargetis note. Recognizing that it was "grossly unfair" to hold Guardian liable on its indorsement of the Sargetis note, the trial court nevertheless ruled, on the basis of essentially uncontroverted evidence pertaining to the issue, that Guardian had no defense of fraud and that unilateral mistake did not provide any kind of defense under the law. Therefore, Stangl was awarded a judgment on the note pursuant to its counterclaim in the amount of $194,021.01. The trial judge was of the view that Guardian had committed a unilateral mistake of law in indorsing the note but that the law afforded no relief on that ground. In addition, Stangl was held liable to Guardian on the Stangl note in the amount of $192,019.32. After the balances were offset against each other, judgment was entered in favor of Stangl in the net amount of $2,001.69. Guardian was also awarded a $106,711.55 judgment on its malpractice cross-claim against the attorneys who had represented it in the transaction with Stangl. That figure represented the amount of Stangl's judgment reduced by Guardian's forty-five percent comparative negligence.

On appeal, Guardian contends that the district court's assessment of liability against it on the Sargetis note was error for a variety of reasons, only one of which we need to address.

## I. TIMELINESS OF APPEAL

We turn first, however, to Stangl's contention that Guardian's notice of appeal was not timely filed and that this appeal must therefore be dismissed.

The filing of post-trial motions, pursuant to Rules 50(b), 52(b) or 59 of the Utah Rules of Civil Procedure, terminates the time for filing a notice of appeal until an order is entered granting or denying such motions. Utah R.Civ.P., 73(a) (repealed 1985).[1] But for the filing of post-trial motions, the notice of appeal was due by July

---

1. Rule 73(a) of the Utah Rules of Civil Procedure, in effect at the time of the proceedings in question, stated in pertinent part:

When an appeal is permitted from a district court to the Supreme Court, the time within which an appeal may be taken shall be one month from the entry of the judgment or order appealed from unless a shorter time is provided by law, except that upon a showing of excusable neglect based on a failure of a party to learn of the entry of the judgment the district court in any action may extend the time for appeal not exceeding one month from the expiration of the original time herein prescribed. The running of the time for appeal is terminated by a timely motion made pursuant to any of the rules hereinafter enumerated, and the full time for appeal fixed in this subdivision commences to run and is to be computed from the entry in the minutes of any of the following orders made upon a timely motion under such rules: granting or denying a motion for judgment under Rule 50(b), or granting or denying a motion under Rule 52(b) to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; or granting or denying a motion under Rule 59 to alter or amend the judgment; or denying a motion for a new trial under Rule 59.

Rule 4(b) of the Rules of the Utah Supreme Court, the current rule which is substantially similar, states in pertinent part:

(b) **Motions post judgment or order.** If a timely motion under the Utah Rules of Civil Procedure is filed in the district court by any party: (1) for judgment under Rule 50(b); (2) under Rule 52(b) to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; (3) under Rule 59 to alter or amend the judgment; or (4) under Rule 59 for a new trial, the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying any other such motion.... A notice of appeal filed before the disposition of any of the above motions shall have no effect. A new notice of appeal must be filed within the prescribed time measured from the entry of the order of the district court disposing of the motion as provided above.

18, 1984. The motions were voluntarily withdrawn and therefore were not ruled on. The day after the withdrawal, August 17, 1984, Guardian filed a notice of appeal and also moved for an extension of time in which to file a notice of appeal. That motion was filed because of an ambiguity in the rules. Rule 73(a) of the Utah Rules of Civil Procedure (as well as Rule 4(b) of the current Rules of the Utah Supreme Court) provides that the time for filing a notice of appeal begins to run again when an order denying the post-judgment motion is entered. However, the rule does not address the situation where no order is entered because the pretrial motions are voluntarily withdrawn.

■ A voluntary withdrawal is tantamount to an order denying a post-trial motion. A voluntary withdrawal may reflect a more considered judgment regarding the validity of such motions. The decision may be the result of more research than was possible in the ten days allowed for filing such motions. Treating a voluntary withdrawal as an order denying the motion may save both judicial time and expense to the parties and therefore ought not to be discouraged.

Stangl's contention, that allowing the time for filing a notice of appeal to run from withdrawal of the post-trial motions can lead to abuse, is without merit. First, Rule 73(a) (and current Rule 4(b)) allows for an extension of time to file a notice of appeal which would have the same effect as the filing of a post-trial motion. Second, insisting on an actual order denying such motions would not deter sham filings made solely as a pretense to obtain more time for filing a notice of appeal. A party would only have to wait for an order denying a sham motion rather than withdraw the motion to achieve additional time. Finally, unless the withdrawal of a post-trial motion is considered the equivalent of an order denying such a motion, the effect of the rule is to penalize a party who elects to withdraw a motion in order to save time. In *U-M Investments v. Ray,* 658 P.2d 1186 (Utah 1982), this Court held that, under Rule 73(a), a pending post-trial motion un-

der Rule 59 rendered ineffective a notice of appeal filed before disposition of the motion. We stated, "It seems only fair and equitable to require an appellant who ... *files* a motion under Rule 59 to file a simple notice of appeal within [the proper time] after his motion has been denied." 658 P.2d at 1187 (emphasis added). *See also Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 61, 103 S.Ct. 400, 403, 74 L.Ed.2d 225 (1982) (under Rule 4(a) of the Federal Rules of Appellate Procedure, a notice of appeal filed while a post-trial motion is pending is "a nullity" and the effect "is as if no notice of appeal were filed at all"); *Skagerberg v. Oklahoma,* 797 F.2d 881, 883 (10th Cir.1986).

There is no suggestion of any improper purpose on Guardian's part in filing its post-trial motions. For these reasons, we hold that the notice of appeal was timely filed, irrespective of whether the order granting additional time for filing had a *nunc pro tunc* effect.

## II. MISTAKE

Guardian asserts that its indorsement of the Sargetis note is unenforceable because the note and guaranty were delivered to Stangl solely for the purpose of enabling Stangl to recoup from third parties what he owed Guardian on his guaranty of the Sargetis note. Guardian further asserts that its indorsement of the note in blank erroneously created in Stangl a right never contemplated by the parties. Guardian also argues that Stangl gave no consideration for the Sargetis note and guaranty and that Stangl acted fraudulently in the transaction.

It is not clear from the record whether the trial court ruled that a unilateral mistake of fact provides no basis either for reformation or rescission of an agreement or that the error was an error of law and that a unilateral mistake of law is not actionable. We hold that whether the error here is deemed a mistake of fact or of law, the law provides relief.

■ Reformation of an instrument for mutual mistake of fact is an equitable rem-

edy that has long been recognized. *E.g., Jacobson v. Jacobson,* 557 P.2d 156 (Utah 1976). Recently we stated that "mistakes as to the legal effect of words used in a contract or deed, or the absence of them, are subject to reformation by the courts." *Haslem v. Ottosen,* 689 P.2d 27, 30 (Utah 1984). Even reformation of an indorsement of a negotiable instrument is proper, if the rights of third parties are not affected, when the parties to the instrument are mistaken as to the scope and legal effect of the indorsement. *See, e.g., L.W. Wentzel Implement Co. v. State Finance Co.,* 63 N.W.2d 525 (N.D.1954); *First Nat'l Bank of Andrews v. Jones,* 635 S.W.2d 950 (Tex. Ct.App.1982); *Rattan v. Dicker,* 373 S.W.2d 306 (Tex.Civ.App.1963).

Whether a mistake is a mutual mistake or a unilateral mistake may have significance, but it is not true, as is sometimes stated, that the law affords a remedy only for a mutual mistake of fact but not for a unilateral mistake of fact. Professor Corbin has referred to the confusion that sometimes still exists:

> Statements are exceedingly common, both in texts and in court opinions, that relief will not be given on the ground of mistake unless the mistake is "mutual." Such a broad generalization is misleading and untrue. Seldom is it accompanied by either definition or analysis. A study of thousands of cases is not necessary to convince us that to err is human, both in the sense of having mistaken ideas and in the sense of performing acts that are evil or unwise. But such a study will show that human mistakes are of great variety in kind with a great variety of causes, that they have a great variety of results, and that the juristic effects vary as the combinations of factors vary.
>
> . . . .
>
> The American Law Institute states the law to be that a contract is not made voidable by a unilateral mistake, however material it may be to the interests of the mistaken party. Without doubt, this has been the prevailing form of statement, along with the even more common form that mistake is not operative unless it is mutual. It is supported by some decisions and by many dicta; but the decisions that are inconsistent with it are too numerous and too appealing to the sense of justice to be disregarded.

3 A. Corbin, *Corbin on Contracts* § 608, at 669–70, 675 (1960) (footnotes ommitted).

A few of our own opinions may have contributed to some misunderstanding of the law of mistake by stating without qualification that the law affords relief only for a mutual mistake. Indeed, this Court has, on occasion, declared that a unilateral mistake provides no basis for relief. For example, in *Deseret Nat'l Bank v. Burton,* 17 Utah 43, 48, 53 P. 215, 216 (1898), we stated, "Equity will not reform a written contract unless the mistake is proved to be the mistake of both parties." The proposition was also stated in *Starley v. Deseret Foods Corp.,* 93 Utah 577, 586, 74 P.2d 1221, 1225 (1938), and *Ashworth v. Charlesworth,* 119 Utah 650, 656–57, 231 P.2d 724, 727 (1951). *See also Bown v. Loveland,* 678 P.2d 292 (Utah 1984). Of course, such broad statements must always be read in light of the facts of each case.

■ Professor Corbin has stated: "There is practically universal agreement that, if the material mistake of one party was caused by the other, either purposely or innocently, or was known to him, or was of such character and accompanied by such circumstances that he had reason to know of it, the mistaken party has a right to rescission." 3 A. Corbin, *Corbin on Contracts,* § 610, at 692 (1960). In truth, Utah law is in accord. When one party's mistake of fact is coupled with knowledge of the mistake by the other party or a mistake is produced by fraud or other inequitable conduct by the nonerring party, the mistake provides a basis for reformation or rescission. *See Thompson v. Smith,* 620 P.2d 520, 523–24 (Utah 1980), *Jensen v. Manila Corp. of the Church of Jesus Christ of Latter–Day Saints,* 565 P.2d 63 (Utah 1977).

With respect to error in the memorialization of an agreement, the Court has stated:

> It is the rule in this forum that the power to reform a written instrument by

reason of mutual mistake exists under three alternative proofs:

> (1) that the instrument as made failed to conform to what *both parties* intended; or (2) that the claiming party was mistaken as to its actual content and the other party, knowing of this mistake, kept silent; or (3) that the claiming party was mistaken as to actual content because of fraudulent affirmative behavior.

*Mabey v. Kay Peterson Constr. Co.*, 682 P.2d 287, 290 (Utah 1984) (emphasis in original). Although this statement is cast in terms of a mutual mistake, it also covers a unilateral mistake made in reducing an agreement to writing. Thus, unilateral mistake in the formalization of a writing provides an appropriate basis for reformation. *McMahon v. Tanner*, 122 Utah 333, 249 P.2d 502 (1952); Greene, *Mistake in the Utah Law of Contracts*, 7 Utah L.Rev. 304, 307 (1961) [hereinafter Greene]; 66 Am.Jur.2d *Reformation of Instruments* § 12, at 537–38, § 28, at 554–55 (1973); 76 C.J.S. *Reformation of Instruments* § 28b, at 364–66 (1952).

 In its most simple and most straightforward sense, the law really only enforces the intent of the parties as to the fundamental agreement between them; a mistake in the recordation or memorialization of an agreement or document may not be exploited by one party to take advantage of the other. Principles of common honesty are not foreign to law and equity. In *McMahon*, 122 Utah at 342, 249 P.2d at 506, the Court ruled that even when the mistake is not mutual, reformation may, nevertheless, be proper

> "where, unknown to one of the parties, an instrument contains a mistake rendering it at variance with the prior understanding and agreement of the parties, and the other party learns of the mistake at the time of the execution of the instrument and later seeks to take advantage of it...."

(quoting *Spirt v. Albert*, 109 Conn. 292, 300, 146 A. 717, 720 (1929)). *See also Cunningham v. Cunningham*, 690 P.2d 549, 552 (Utah 1984); *Bown*, 678 P.2d 292; Greene at 307. Furthermore, the law may also provide a remedy where the parties use *legal* terms that fail to effectuate their purposes, *Haslem*, 689 P.2d at 30, irrespective of negligence on the part of the erring party. *Mountain States Tel. & Tel. v. Sohm*, 755 P.2d 155, 159 (Utah 1988).

Even apart from cases involving an incorrect memorialization of an agreement, where a unilateral mistake of fact is the basis of the parties' agreement, a court is not always without power to afford relief. For example, in *Tolboe Constr. Co. v. Staker Paving & Constr. Co.*, 682 P.2d 843 (Utah 1984), we upheld the trial court's ruling that an offeree could not rely on promissory estoppel when the offeror made a unilateral mistake which the offeree either knew or must have known about. *See also Puget Sound Nat'l Bank v. Selivanoff*, 9 Wash.App. 676, 514 P.2d 175 (1973); 13 S. Williston, *A Treatise on the Law of Contracts* § 1548 (3d ed.1970). *But see Ashworth*, 119 Utah 650, 231 P.2d 724; Restatement (Second) of Contracts § 153 (1981).

In *Mountain States*, the Court employed mutual mistake terminology in dealing with a mistake by one party in the memorialization of the agreement and knowledge of the mistake by the other party. As in the instant case, the mutual understanding of the parties was erroneously reduced to writing by one of the parties, and the error produced an effect not contemplated by either of the parties at the time of the agreement, although the nonerring party thereafter sought to take advantage of the mistake by asserting that the law provided no relief for a unilateral mistake. The Court held that the agreement should be reformed even though the defendant, the party seeking reformation, owed the plaintiff no special legal duty and even though the defendant may have been negligent. 755 P.2d at 159. The Court stated that the nonerring party could not defeat reformation on the ground that it would lose a benefit that the parties in their agreement had not intended. *Id.*

Since the mistake in memorialization of the agreement was committed by one party and since the other party sought to concur

in the mistake and take advantage of it, it can be said that *Mountain States* is a mutual mistake case, as the Court in the opinion states. On the other hand, the party seeking reformation in *Mountain States* simply made a one-sided mistake; and although the other side knew about the mistake, that party did not itself make a mistake. It sought only to take advantage of it. 755 P.2d at 159. The characterization of the error, however, does not affect the right to a remedy. *See also Toland v. Corey*, 6 Utah 392, 24 P. 190 (1890).

Furthermore, in this case, characterization of the mistake as a mistake of law does not deprive Guardian of a right to relief. *Haslem*, 689 P.2d 27; *Toland*, 6 Utah at 395–96, 24 P. at 191. As in *Haslem*, the parties in this case were in agreement as to the result to be achieved by their agreement, and although the parties' minds did not advert specifically to whether the indorsement should be with or without recourse, the very nature of their agreement was inconsistent with the proposition that Guardian would become liable to Stangl by transferring the Sargetis note to him. Stangl's cause is not advanced by calling Guardian's error one of law. *See also Pasotex Petroleum Co. v. Cameron*, 283 F.2d 63, 66–68 (10th Cir.1960); 3 A. Corbin, *Corbin on Contracts* § 619 (1960); Restatement (Second) of Contracts § 155 (1979). Nor does it make any difference that Guardian may have been negligent. *Mountain States*, 755 P.2d at 159.

### III. MISTAKE BY GUARDIAN

■ This case is here on an appeal from a directed verdict against Guardian and from the trial court's refusal to grant relief to Guardian on its declaratory judgment action. The trial court recognized that the evidence was not in conflict and ruled that Guardian could not recover as a matter of law. We agree that the evidence was not in conflict, but we conclude that Guardian does have a legal right to reformation.

It is clear that Guardian made a mistake by indorsing the Sargetis note without limiting its own liability either by a restrictive indorsement or by an assignment of the note to Stangl. There is no evidence that either party contemplated that Guardian would be liable to Stangl on the Sargetis note. The very idea is contrary to what the parties intended to accomplish and is inconsistent with any kind of reasonable business transaction.

Stangl admittedly owed Guardian some $192,000 on the Sargetis note; there is no evidence whatsoever that either party thought that Stangl should be entitled to avoid that debt. The deal between Guardian and Stangl was simple and straightforward. Guardian would provide Stangl with a possible means of mitigating losses by giving Stangl the indorsed Sargetis note and Stangl's guarantee of the note in exchange for a new note. Indeed, Stangl does not even contend that the agreement was that he could recover on Guardian's indorsement. He correctly states in his brief that "indorsement of the note was never discussed. The subject never arose."

In fact, Stangl refutes Guardian's arguments in support of its fraud claim by stating in his brief, "[Stangl] did not have a duty to disclose something to Mr. Webb he never even became aware of until a week later," i.e., after the deal was structured, as Stangl puts it. In a similar vein, Stangl concedes that "[o]ne cannot misrepresent an intent which does not exist" and "[o]nce Stangl did learn of his rights respecting the indorsement by Guardian, the negotiations were over and the deal was struck." All of that is true, and that is no doubt why Guardian lost its fraud claim in the trial court. However, those statements emphasize the point that Stangl never intended Guardian to be liable on the Sargetis note as an indorser and neither did Guardian. In other words, the liability of Guardian in the amount of $192,000 on the Sargetis note was a pure windfall to Stangl.

Although Stangl's attorney, Maak, testified that he never specifically stated that Stangl sought recovery against NACM, he also testified that the sole purpose for obtaining the note from Guardian was to enable Stangl to recover from Sargetis. Dearinger, Guardian's attorney, testified as follows:

Q. Mr. Dearinger, you have testified that you had no discussion with Mr. Maak concerning whether or not Mr. Stangl would come back against the bank; isn't that correct?

A. I think I said I had no discussions with him that Mr. Stangl had any desire to go against the bank.

Q. Did the subject even come up?

A. Only in the context that he indicated that he only wanted the assignment of the note so they could pursue Mr. Sargetis and Sargetis Fine Cars.

Q. Did he say that was the only reason he wanted to purchase that note?

A. To my recollection.

Russell Webb, who initially negotiated and ultimately approved the transaction with Stangl, agreed that he did not "understand or have any kind of understanding that [Stangl] was seeking any kind of endorser liability back against the bank." In fact, Webb flatly stated that he would have refused to sign the documents if he had known that Stangl sought indorser liability from Guardian.

The evidence unequivocally supports the conclusion that the parties did not intend Guardian to be liable on the Sargetis note after transferring it to Stangl.[2] In short, Guardian's indorsement allowing recourse against it was an error on Guardian's part which Stangl has unjustifiably sought to take advantage of.

### IV. THE PLEADINGS AND GUARDIAN'S RIGHT TO RELIEF

Stangl also asserts that Guardian is not entitled to reformation of the indorsement because it failed to seek reformation at trial.

■ Guardian's complaint sought equitable relief in the form of a judgment declaring the rights of the parties under the Sargetis note. In addition, Guardian pleaded mistake as an affirmative defense to Stangl's counterclaim on the Sargetis note. In *Behrens v. Raleigh Hills Hosp., Inc.*, 675 P.2d 1179, 1182 (Utah 1983), we reiterated that the policy of our rules of procedure is to decide cases on the merits rather than pleading technicalities. Rule 54(c)(1) of the Utah Rules of Civil Procedure provides that a court shall grant all the relief to which the prevailing party is entitled, even if a demand was not made for such relief in the pleadings. Indeed, in *Mabey v. Kay Peterson Constr. Co.*, 682 P.2d 287, 290 (Utah 1984), we squarely held that Rule 54(c)(1) allows a court to reform a document if a mutual mistake is established, even if the issue of mutual mistake was not raised and reformation was not demanded in the pleadings. Here, the complaint for a declaratory judgment was a sufficient request for relief, and in any event, the rule laid down in *Mabey* also applies where the mistake is unilateral and reformation is appropriate.

### V. GUARDIAN'S NEGLIGENCE

■ Even though Guardian was negligent, that does not justify Stangl's overreaching. In *Mountain States Tel. & Tel. v. Sohm*, 755 P.2d 155, 159 (Utah 1988), the Court held that negligence is not a sufficient ground for denying reformation for mistake in the memorialization of an agreement. Since no third-party rights arise from the note, *Mountain States* is dispositive here on the issue of negligence.

### VI. DISPOSITION

■ From the foregoing discussion, it would ordinarily follow that the judgment against Guardian on the Sargetis note

---

2. Stangl's attorney, Maak, testified that while riding to the bank with Stangl to sign the documents pursuant to the parties' agreement, he told Stangl that the bank had agreed to allow him to purchase the Sargetis note with another note that he was to give to the bank, and that by acquiring the bank's rights under the Sargetis note, he would have two things he could do. First thing he could do was to try to recover under the promissory note from Sargetis. And the second thing he could do would be if he were unable to get whole from the assets of Sargetis, the bank would be liable as an endorser on the note to pay the difference.

The latter statement was not made to any Guardian officers, and Stangl himself admits in his brief that that consequence was never intended to be part of the deal.

should be reversed and the case remanded for further proceedings. However, this case is complicated by the judgment against Guardian's attorneys on the third-party complaint. Guardian's attorneys have not appealed the $106,771.55 judgment against them for malpractice, and therefore the validity of Guardian's judgment against them is not before us. It would, however, be inequitable to reverse the judgment against Guardian if the judgment against the attorneys is allowed to stand. However, the law is not without a remedy. Rule 60(b) of the Utah Rules of Civil Procedure provides:

> On motion and upon such terms as are just, the court may in the furtherance of justice relieve a party ... from a final judgment, order, or proceeding [if] ... (6) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application....

A motion to set aside a judgment that is based on a reversed judgment must be made within a reasonable time. *See generally Kelly v. Scott,* 5 Utah 2d 159, 298 P.2d 821 (1956).

To avoid a windfall to Guardian, our vacating the judgment against it on the Sargetis note is conditioned on Guardian's first obtaining an order from the district court vacating Guardian's judgment against its attorneys.

The parties are to bear their own costs.

HALL, C.J., and HOWE, Associate C.J., DURHAM and ZIMMERMAN, JJ., concur.